810 So.2d 700 (2001)
Ex parte C.V.
(Re C.V. v. J.M.J. and T.F.J.)
1981316.
Supreme Court of Alabama.
April 27, 2001.
Rehearing Denied July 13, 2001.
*701 Martha Jane Patton, Birmingham, for petitioner.
Albert L. Jordan, Phillip D. Corley, Jr., Albert S. Agricola, Jr., of Wallace, Jordan, Ratliff & Brandt, L.L.C., Birmingham; K. Scott Stapp of Manley, Traeger, Perry & Stapp, Demopolis; Anthony B. Marchese, Tampa, Florida; and Bryant A. Whitmire, Jr., of Whitmire & Cole, Birmingham, for respondents.
Karen N. Dice, guardian ad litem, Tuscaloosa.
David G. Wirtes, Jr., of Cunningham, Bounds, Yance, Crowder & Brown, L.L.C., Mobile; Robert F. Prince and Paul W. Patterson II of Prince Law Firm, P.C., Tuscaloosa, for amicus curiae Alabama Trial Lawyers Ass'n, in support of guardian ad litem's application for rehearing.

On Application for Rehearing
PER CURIAM.
The November 17, 2000, opinion of this Court is withdrawn and the following is substituted therefor.
After complex proceedings, the Tuscaloosa County Circuit Court issued a judgment terminating the parental rights of the natural father C.V. in his son Baby Boy G. and awarding custody of the child to J.M.J. and T.F.J., who had filed the petition to terminate C.V.'s parental rights and who likewise had filed a petition to *702 adopt the child. The father, C.V., appealed to the Court of Civil Appeals, which affirmed. On certiorari review, we reversed and rendered in a lengthy opinion.
On J.M.J. and T.F.J.'s application for rehearing, we are withdrawing that opinion and substituting this one. Each Justice who wants to supply facts or to supply his or her rationale is doing so in a special writing.
On the application of J.M.J. and T.F.J. for rehearing in this cause, this Court now adjudges that the Tuscaloosa County Circuit Court erred in terminating the father's parental rights and in awarding custody of Baby Boy G. to J.M.J. and T.F.J., the prospective adoptive parents; and the Court of Civil Appeals erred in affirming the judgment of the Tuscaloosa County Circuit Court. Therefore, we reverse the judgment of the Court of Civil Appeals. Because the evidence in this case does not tend to prove any of Alabama's applicable statutory criteria for terminating the father's parental rights, we adjudge that C.V.'s parental rights as the father of Baby Boy G. are not terminated; and we remand this cause directly to the Tuscaloosa County Circuit Court for proceedings to determine the proper custody of Baby Boy G.
APPLICATION OVERRULED; OPINION OF NOVEMBER 17, 2000, WITHDRAWN; OPINION SUBSTITUTED; REVERSED; JUDGMENT ENTERED IN PART; AND REMANDED WITH INSTRUCTIONS.
MOORE, C.J., and SEE, LYONS, and JOHNSTONE, JJ., concur specially.
HOUSTON, BROWN, and WOODALL, JJ., dissent from the rationale and concur in the result.
STUART, J., concurs in the result in part and dissents in part.
HARWOOD, J., recuses himself (with statement).
MOORE, Chief Justice (concurring specially).
This case presents issues of utmost concern to all citizens of this State: the rights of a natural parent to custody of a minor child, the welfare of that child, and the interpretation of the adoption and custody laws of this State. The facts of this case have been ably presented by both sides, and the issues are now before this Court on application for rehearing filed by the prospective adoptive parents of Baby Boy G. I concur with the Court's order reversing the judgment of the Court of Civil Appeals, which affirmed the trial court's termination of C.V.'s parental rights, and remanding this case directly to the trial court for further proceedings to determine the custody of this child. I write specially to explain my rationale for agreeing that that is the correct result in this case. I agree with Justice See's special writing that a parent can abandon a child before birth and that it is possible for a parent to give, before a child's birth, implied consent to an adoption.
I cannot agree, however, with the reasoning of some of my respected colleagues, who also write specially, on several important grounds. I believe that it is possible for abandonment, as that term is defined by Ala.Code 1975, § 26-10A-2(1), to occur before a child's birth when a parent fails to perform parental duties or fails to claim the rights of a parent. I also consider a parent's conduct before a child's birth to be relevant evidence indicating that parent's implied consent to an adoption under Ala.Code 1975, § 26-10A-9.
Alabama law requires that a court, before terminating parental rights, determine *703 that the parents are unable or unwilling to discharge their parental responsibilities. Ala.Code 1975, § 26-18-7. Initially, the law favors the natural parents of a child by presuming that a child's best interests are served by placing the child in the custody of its natural parents. However, when a parent has abandoned a child for six months immediately preceding the filing of the petition to terminate the parental rights, that presumption is rebutted, and a new presumption that the natural parent is unwilling or unable to presently care for the child is created. Ala.Code 1975, § 26-18-7(c).
This Court must give deference to the trial court's finding, based on ore tenus evidence, that the natural father abandoned the child by his prebirth conduct; however, this Court must follow the law as set forth in Ala.Code 1975, § 26-18-7(c). That statute requires that "in any case where the parents have abandoned a child as herein defined and such abandonment continues for a period of six months next preceding the filing of the petition, such facts shall constitute a rebuttable presumption that the parents are unable or unwilling to act as parents." (Emphasis added.)
On April 10, 1996, C.V. filed an action seeking to obtain custody of his son; since then he has continued actively to seek custody of Baby Boy G. up to this present application for rehearing. The prospective adoptive parents did not file a petition to terminate the C.V.'s parental rights until October 17, 1997. There was no evidence before the trial court that C.V. had abandoned the child six months "next preceding the filing of the petition" on October 17, 1997. Because the prospective adoptive parents have not produced evidence satisfying the statutory requirements of Ala.Code 1975, § 26-18-7(c), there can be no presumption that C.V. was unwilling or unable to act as a parent.
A parent's conduct before the birth of the child can evince implied consent to an adoption. This was the case even before the 1999 amendment to § 26-10A-9 became effective on June 11, 1999. However, even if this Court were to assume that C.V. had impliedly consented to the adoption of his son, § 26-10A-13, Ala.Code 1975, provides that an express consent to adoption can be withdrawn:
"(a) A consent or relinquishment may be taken at any time, except that once signed or confirmed, may be withdrawn within five days after birth or within five days after signing of the consent or relinquishment, whichever comes last.
"(b) Consent or relinquishment can be withdrawn if the court finds that the withdrawal is reasonable under the circumstances and consistent with the best interest of the child within 14 days after the birth of the child or within 14 days after signing of the consent or relinquishment, whichever comes last."
Express consent certainly communicates a clearer assent by a parent to an adoption than does implied consent. Logically, if a parent can withdraw express consent to an adoption, a parent can withdraw implied consent to an adoption. If, in fact, we were to conclude that C.V. had impliedly consented to the adoption of this child, C.V.'s actions over the last five years or more have amply demonstrated that he has withdrawn any such implied consent to this adoption.
Therefore, I concur.
SEE, J., concurs.
SEE, Justice (concurring specially).
This is a tragic case, which has been made more difficult by the judicial system's failure at every level to find a way to *704 resolve it quickly.[1] I yearned and prayed that mediation[2] would provide a resolution that all parties would agree was in the best interest of Baby Boy G. That has not happened.
I have sworn to "faithfully and honestly discharge the duties of [my] office," Art. XVI, § 279, Ala. Const.1901, to decide each case dispassionately, based on the rule of law, and "to apply the law with an eye to the future as well as with concern for the result in the particular case before us." Brewer v. Williams, 430 U.S. 387, 415, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (Stevens, J., concurring); see also Canon 3.A.(1), Canons of Judicial Ethics. Therefore, although I fully understand that "[n]othing that [I] write, no matter how well reasoned or forcefully expressed," 430 U.S. at 415, 97 S.Ct. 1232, can lessen the pain of all involved, I turn to the task of explaining my understanding of the law I am sworn before God and man to uphold,[3] as it applies to this case.
For the reasons explained below, I agree that the trial court erred by terminating C.V.'s parental rights as to Baby Boy G. and further erred by holding that C.V.'s consent to the adoption of Baby Boy G. either was implied or was not necessary.

Termination of Parental Rights
Baby Boy G. has been in the custody of the prospective adoptive parents since shortly after his birth; that fact alone, however, does not provide a sufficient basis for terminating C.V.'s parental rights.[4] Proceedings to terminate parental rights are purely statutory in Alabama, and there are only two statutory grounds for terminating parental rights: (1) "that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child," or (2) "that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future." Ala.Code 1975, § 26-18-7(a). The Legislature's use of the present tense in setting forth the statutory grounds for terminating parental rights indicates that the inquiry in such a proceeding is whether one of those grounds exists at the time of the proceeding, not whether a ground may have existed at some point in the past.
*705 Although under the ore tenus rule this Court defers to a trial court's judgment when the court's findings of fact are based on evidence presented ore tenus, this Court must nevertheless reverse the trial court's judgment when, as here, it is "clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence." Odom v. Hull, 658 So.2d 442, 444 (Ala.1995). The trial court's order does not expressly find the existence of one of the two statutory grounds for terminating a parent's rights, and the evidence is insufficient to support a finding either that C.V. was, when the trial court terminated his parental rights, unable or unwilling to take on the responsibilities of fatherhood as to Baby Boy G. or that his conduct or condition rendered him unable to properly care for Baby Boy G.[5]
A presumption that the parents are "unable or unwilling to act as parents" arises when "the parents have abandoned a child as ... defined [in § 26-18-3(1)] and such abandonment continues for a period of six months next preceding the filing of the petition [to terminate the parents' parental rights]." § 26-18-7(c). In this case, however, even if C.V.'s conduct before his son was born can be construed to be "abandonment" within the meaning of § 26-18-3(1), the presumption that he was unable or unwilling to raise his son did not arise. The prospective adoptive parents filed their petition to terminate the parental rights of Baby Boy G.'s birth parents on October 17, 1997. There was no evidence before the trial court that for six months preceding October 17, 1997, C.V. had abandoned Baby Boy G.; therefore, no presumption could arise that C.V. was unable or unwilling to act as a parent.
Because there was no evidence to support a finding that, at the time the trial court terminated his parental rights, C.V. was unable or unwilling to take on the responsibilities of a father as to Baby Boy G., the trial court erred by terminating C.V.'s parental rights.

Implied Consent to Adoption
The trial court held that C.V.'s consent to the adoption of Baby Boy G. was implied from C.V.'s "conduct as it relates to the minor child and to the birth mother prior to and after the child's birth." See Ala.Code 1975, § 26-10A-9(2) (providing that a parent who abandons a child for six months impliedly consents to that child's adoption). C.V. argues that his prebirth conduct toward the birth mother is irrelevant to the question whether he abandoned Baby Boy G. I disagree. It is clear that a parent can expressly consent to the adoption of his or her child before the child's birth, see Ala.Code 1975, §§ 26-10A-11(2), 26-10A-13(a) and (b). I see no reason a parent cannot also impliedly consent to a child's adoption before that child's birth. However, the Legislature has provided that, after the child's birth, a parent can withdraw his express prebirth consent to the child's adoption. See § 26-10A-13. If we are to recognize prebirth implied consent to adoption, then, I believe, consistent with the statutory structure for express consent and its withdrawal, we must also recognize implied withdrawal of prebirth consent.
A parent impliedly consents to an adoption by:
"(1) Leaving the adoptee without provision for his or her identification for a period of 30 days; or

*706 "(2) Knowingly leaving the adoptee with others without provision for support and without communication, or not otherwise maintaining a significant parental relationship with the adoptee for a period of six months; or
"(3) Receiving notification of the pendency of the adoption proceedings under Section 26-10A-17 and failing to answer or otherwise respond to the petition within 30 days."
Ala.Code 1975, § 26-10A-9 (as it read before the amendment effective June 11, 1999) (emphasis added). The emphasized language is the only language that could be applicable in this case. Thus, the issue is whether C.V. failed to "maintain[ ] a significant parental relationship with [Baby Boy G.] for a period of six months."
The trial court found that C.V. had "abused and abandoned [the birth mother] physically, emotionally, and financially, during her pregnancy with [Baby Boy G.]" by failing to provide her any financial support, by physically abusing her during her pregnancy, and by moving out of the apartment where they lived and taking almost everything with him, including the food, the dishes, the Christmas tree (C.V. moved during the holiday season), and all the furniture except a bed. Although C.V. vigorously disputes this recitation of the facts, the record contains sufficient evidence to support the trial court's findings. Because C.V.'s conduct before the birth of Baby Boy G. was inconsistent with accepting the responsibilities of fatherhood, it could be construed to constitute implied consent to the adoption. However, the undisputed evidence shows that, since shortly after Baby Boy G.'s birth, C.V. has consistently and persistently sought custody of his son. A few days after the mother told C.V. that their child had been stillborn, C.V. asked for documentation to confirm that statement. When the mother could not provide documentation, C.V. checked with local hospitals and funeral homes. Less than two weeks later, he filed an action against the mother, seeking a declaration of his paternity and custody of his child. I would hold that, assuming C.V.'s prebirth conduct amounted to abandonment of Baby Boy G., C.V.'s actions after he learned of the birth of his son clearly indicate his intent to withdraw his implied consent to the adoption.
For these reasons, I concur in the main opinion. I also concur in the special writing of Chief Justice Moore.
MOORE, C.J., concurs.
LYONS, Justice (concurring specially).
Much notoriety has ensued since we released our original opinion in this case. Numerous faxes and letters have been delivered to my chambers. Because the Canons of Judicial Ethics preclude me from reviewing materials submitted to this Court outside the procedures provided in the Alabama Rules of Appellate Procedure, I have instructed my staff to deliver any such faxes and letters directly to the office of the clerk of this Court. However, being aware of the degree, if not the content, of the public discussion concerning this case, I am compelled to preface my views on the merits of this case with some observations on the authority and responsibility of judges.
A judge exercises judicial power in two ways. A judge decides issues based upon rights derived from precedent established by previous decisions involving parties with similar cases or issues. A judge also decides issues based upon the interpretation of rights grounded in enactments such as a statute or a constitutional provision. On the one hand, when a judge applies the law based solely on decisions in earlier cases not governed by statutes or constitutional *707 provisions, such as whether a contract has been breached, the judge is acting in an area where the courts, through precedent from these earlier cases, are the exclusive source of the controlling authority the judge must apply to decide the case. In such instances, the latitude of a judge of an appellate court is restricted only by a healthy reluctance to make unnecessary changes in the law, lest we forfeit the good to society that comes from the predictability of the law. On the other hand, in cases turning on rights created by statute or by constitutional provision, the Legislature or the peoplenot judgesare the source of the controlling authority the judge must apply to decide the case. The oath of judicial office requires that in those cases a judge apply the law, to the best of his or her ability, in a manner consistent with the will of the body that created the authority, regardless of any personal views as to the wisdom of the Legislature or the people in expressing that will.
The proceeding before us arises out of the attempted adoption of a child. The adoptive parents and the biological father disagree as to the effect of applicable statutes on the status of the attempted adoption. The source of our adoption laws is the Alabama Legislature. We do not have before us a case where the law has evolved solely from earlier judicial opinions recognizing certain rights and responsibilities under similar circumstances in an area not governed by a statute or a constitutional provision. Consequently, our latitude is constricted because, when applying principles of statutory construction to those laws regulating adoption, as we must here, we do not have the authority to amend, revise, or rewrite those statutes. The separation-of-powers doctrine set forth at Art. III, § 43, Constitution of Alabama of 1901, requires us to restrict our inquiry to determining the intent of the Legislature in enacting those statutes regulating adoption.
Reasonable persons may disagree with my views on how we should construe the adoption statutes in this case. Some of my fellow Justices have expressed their disagreement. I do not mean to suggest in any way that their views are motivated by anything other than their sincerely held understanding of how the applicable statutes should be construed.
Those unfamiliar with the basis upon which we must decide this case may well consider the result I support insensitive to such issues as the well-being of the child, the rights of the unborn, or the vital role of adoptive parents in society and in this proceeding. However, until my oath is revised to accommodate the creativity necessary to resolve cases based solely on such considerations, I cannot, even if I were so disposed, trump the applicable statute with personal views I cannot reconcile with the statute I am being asked to construe. The Justices of the Court are obliged by oath to respect the limitations on the exercise of judicial power imposed by the separation-of-powers doctrine. In cases where the Legislature, acting through statutes, or the people, acting through a duly ratified constitutional provision, are the source of the authority that we must apply to decide the case before us, we are not permitted to add to or to change those enactments.
My interpretation of the statutes that control in this case leads me to concur with the per curiam opinion. Section 26-10A-2(1), Ala.Code 1975, defines "abandonment" as:
"A voluntary and intentional relinquishment of the custody of a minor by parent, or a withholding from the minor, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the *708 failure to claim the rights of a parent, or the failure to perform the duties of a parent."
The word "custody" in § 26-10A-2(1) has no logical field of operation, at least as to a father, before a child's birth. Those portions of § 26-10A-2(1) most compatible with the concept of prebirth abandonment refer to a parent's withholding, without good cause or excuse, his or her care, protection, and maintenance, or to a parent's "failure to claim rights of a parent, or the failure to perform the duties of a parent." However, no matter how compelling the case for a father to be concerned with the health and well-being of his child before it is born, an interpretation of § 26-10A-2(1) that would make such a concern relevant in an abandonment case conflicts with clear definitions in the Alabama Adoption Code as it read at the commencement of this proceeding.[6]
Section 26-10A-2, Ala.Code 1975, provides the definitions to be used in the chapter of the Code entitled "Alabama Adoption Code." Section 26-10A-2(9) defines "parent" as the "[n]atural or legal father or mother." A father is defined as "[a] male person who is the biological father of the minor." § 26-10A-2(5) (emphasis added). A minor is "[a] person under the age of 19." § 26-10A-2(7). Title 26, Chapter 10A, does not define the word "child" nor does the word "child" appear in the definition of "abandonment" found at § 26-10A-2(1). Since the counting of one's age does not begin until birth, I cannot conclude that a minor"[a] person under the age of 19"includes an unborn child and, at the same time, adhere to the text of the applicable statutes. I am unable to find in § 26-10A-2, which provides the definitions to be used in the Alabama Adoption Code, any authority to augment that definition by referring to Black's Law Dictionary or to any other extraneous source.
I cannot accept In re Adoption of Doe, 543 So.2d 741 (Fla.), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989), as persuasive authority. We have not been asked to apply Florida law; moreover, the Florida statute describing abandonment (Fla.Stat. Ch. 39.01) contains defined terms the Florida court did not apply in that case. Therefore, the applicable Alabama statutes compel me, regardless of my personal views on when life begins, to interpret the reference to "parent" in § 26-10A-2(1), when read in conjunction with § 26-10A-2(5) (defining a father as "[a] male person who is the biological father of the minor"), as meaning a father of a child who has been born. The Legislature recognized the theory of prebirth abandonment by amending § 26-10A-9, effective June 11, 1999. Also effective June 11, 1999, the Legislature amended § 26-10A-2(7), defining a "minor" as "[a] person under the age of 19," so as to limit that term to "a minor parent only." See § 26-10A-4(7). These proceedings predate those amendments; therefore, those amendments are not applicable here. The fact that the Legislature deemed it appropriate to make substantial changes to our adoption laws to accommodate the doctrine of prebirth abandonment corroborates my view as to its unavailability for proceedings that predate these amendments.
Based on similar reasoning, I find nothing in § 26-10A-9, Ala.Code 1975, providing *709 when consent to, or relinquishment for, an adoption may be implied, before that statute was amended, to support the theory that prebirth conduct toward the child or the mother should be a relevant consideration in determining whether a parent has abandoned a child. The statute recites those acts on the part of a "parent" from which consent to an adoption or the relinquishment of parental rights might be implied. Because the parent in this case was, at the time of this proceeding, the father of a minor, that is, a child who had been born, § 26-10A-9 had no field of operation here. My views as to the inapplicability of the theories of prebirth abandonment or of implied consent to the adoption in this case render it unnecessary to evaluate the evidence concerning C.V.'s prebirth conduct.
On original deliverance, the Court voted 5-4 to order the immediate surrender of the child to the father. On rehearing, the Court has unanimously concluded that its mandate in the original opinion requiring the adoptive parents to surrender custody of Baby Boy G. to the father without further proceedings was not appropriate. On remand, the trial court should consider the custody issue further.
JOHNSTONE, Justice (concurring specially).
I concur with the main opinion. I will supply a complete recitation of the facts and will present the rationale I think is correct. The purpose of the detail in the recitation of facts is to demonstrate the patent incorrectness of any theory that the natural father abandoned his child.

Facts
N.G. (the birth mother) and C.V. (the father), Florida residents, met during the summer of 1994. On February 6, 1995, the father and birth mother had their first date. They began an exclusive relationship in February 1995. From February through July 1995, the father and the birth mother dated and sometimes cohabited. In July 1995, the father and the birth mother learned that the birth mother was pregnant.
On August 20, 1995, the father and birth mother became engaged and moved into an apartment together. After the father informed the maternal grandmother of birth mother's pregnancy, the birth mother called the Pinellas County Sheriffs Department and reported that the father had pushed her down and had hit her, that she had then hit the father with a "hanger," that the father had grabbed her by the throat, that she had gotten away and had run to the front door of their apartment, that the father had again pushed her down, and that she had hit her head on the couch. On the basis of the birth mother's complaint, Pinellas County sheriffs deputies arrested the father for assault. The father told the deputies that the birth mother had bitten him earlier that day and that the birth mother had dislocated her shoulder when he held onto her arm as the birth mother attempted to jump out of his truck while the truck was traveling at 55 miles per hour. The birth mother did not seek medical treatment. No criminal charges were brought against the father
In September 1995, the father and birth mother lived together. Without the father's knowledge, the birth mother called the "Gift of Life Adoption Services," a Florida adoption agency, to arrange for the adoption of the unborn child. The birth mother received financial support from the adoption agency.
In October 1995, the birth mother called the Pinellas County Sheriff's Department and reported that she "was having a verbal argument with [the father]." She also reported being scared that he might do her harm. The father left the apartment before *710 deputies arrived at the apartment. The deputies took no action against the father.
In November 1995, the father and birth mother lived together. In November or December 1995, the father moved out of the apartment. On January 3, 1996, the birth mother and the father argued while in the father's truck on the way to a Lamaze birthing class. The birth mother called the Pinellas County Sheriff's Department and reported that the father had assaulted her. The birth mother told a responding deputy that the father had grabbed her arm when she tried to exit the father's truck. She stated also that the father had not slapped or hit her. The deputy reported that the birth mother was uninjured and that she was unwilling to press charges against the father because she believed that the father grabbed her arm to keep her from exiting the truck while the truck was moving.
On January 6, 1996, the birth mother called the father to take her to Lamaze class. The father took the birth mother to Lamaze class. After January 6, 1996, the father called and visited the maternal grandmother and the maternal great-grandmother, looking for the birth mother. In late January 1996, the birth mother secretly took money from the Gift of Life Adoption Services and traveled to Colorado. She did not inform the father of her plans.
In early February 1996, the birth mother returned to Florida without informing the father of her return. On February 5, 1996, the birth mother signed an affidavit stating that C.V. was the father of her unborn child. Thereafter, the Gift of Life Adoption Services telephoned and wrote the father and requested that he consent to the adoption of his unborn child. The father refused to consent to the adoption. After the father refused to give his consent to the adoption of the unborn child, the Gift of Life Adoption Services refused to work with the birth mother.
On February 11, 1996, the father left a note at the birth mother's apartment. In the note the father asked the birth mother to marry him. Between February 11 and 26, 1996, the father looked for the birth mother at her apartment, at the maternal grandmother's apartment, and at the maternal great-grandmother's home. The father left notes for the birth mother. During this time, Adoption by Choice, Inc. (ABC), provided the birth mother with a ticket to Colorado.
In early March 1996, the birth mother returned to Florida, but did not notify the father of her return. She then arranged for ABC to place her unborn child for adoption. The birth mother lied to ABC about the identity of the father of her unborn child. The birth mother told ABC that she did not know who the father was. On March 11, 1996, the father hired an attorney. On March 12, 1996, the birth mother signed a form relinquishing her parental rights to her unborn child.
On March 19, 1996, the birth mother gave birth to Baby Boy G. After she was discharged from the hospital, the birth mother telephoned the father, who went to the birth mother's apartment. The birth mother informed the father that their child had been stillborn. The father was very upset. On March 20, 1996, the birth mother signed an affidavit surrendering her parental rights and consenting to the adoption of Baby Boy G. She also signed a second affidavit stating that the name and whereabouts of the "putative father" were "unknown."
On March 22, 1996, without knowledge of the father, ABC accepted payment of $17,400 from J.M.J. and T.F.J. (the prospective adoptive parents), an Alabama *711 couple, and placed Baby Boy G. with them for the purposes of a final adoption. The prospective adoptive parents accepted Baby Boy G. with written acknowledgement that their adoption of Baby Boy G. was "at risk" because the father had not consented to the adoption. On March 25, 1996, the prospective adoptive parents returned with Baby Boy G. to the couple's home in Tuscaloosa, Alabama.
In late March, the father asked the birth mother for a death certificate or other documents to prove that their child had been stillborn. The birth mother did not have and could not produce any documents to support her statement that their child had been stillborn. During late March through early April, the father, the paternal grandmother, and the father's friends checked with the bureau of "vital statistics" and checked also with hospitals and funeral homes for a death certificate. They could not locate a death certificate for Baby Boy G.
On April 10, 1996, in the Circuit Court of Pinellas County, Florida, the father filed a paternity and custody action against the birth mother. He asserted paternity of Baby Boy G. and sought custody of Baby Boy G. On May 22, 1996, in the Circuit Court of Hillsborough County, Florida, ABC petitioned the court to terminate the "unknown" father's paternal rights to Baby Boy G. On May 26, 1996, in the Pinellas County Circuit Court, the father filed a "Motion for Temporary Injunction." On May 31, 1996, in the Pinellas County Circuit Court, the father filed a "Subpoena Duces Tecum Without Deposition" to Helen Ellis Hospital, Dr. Matthew Conrad, and Gift of Life Adoption Services.
On June 6, 1996, in the Pinellas County Circuit Court, the father filed "Notice of Production From Non-Party" to Charles D. Hinton, Esq., and an "Amended Notice of Hearing." During a hearing in the Pinellas County Circuit Court in June 1996, the birth mother admitted that she had given birth to a live baby boy, Baby Boy G., that the father had fathered Baby Boy G., and that she had lied to the father and to ABC about Baby Boy G. By orders dated July 9 and July 10, 1996, the Pinellas County Circuit Court determined the father to be Baby Boy G.'s biological father. On July 19, 1996, in the Pinellas County Circuit Court, the father filed a "Petition for Writ of Habeas Corpus."
On August 12, 1996, the father petitioned the Pinellas County Circuit Court for an expedited determination of the temporary custody of Baby Boy G. On August 26, 1996, the prospective adoptive parents anonymously moved to intervene in ABC's Hillsborough County action to terminate the father's parental rights. The same day, in the Hillsborough County Circuit Court, the prospective adoptive parents also anonymously filed a declaratory judgment action asserting the theory of prebirth abandonment by the father as constituting implied consent to the adoption of Baby Boy G.
On September 9, 1996, in the Pinellas County Circuit Court, the father filed a "Notice of Hearing." On September 16, 1996, in the Pinellas County Circuit Court, the father filed a "Motion for Contempt." On September 20, 1996, in the Pinellas County Circuit Court, the father filed an "Amended Notice of Hearing." On September 23, 1996, in the Pinellas County Circuit Court, the father filed a "Notice of Production From Non-Party" to Gift of Life Adoption Services. On September 30, 1996, in the Pinellas County Circuit Court, the father filed a "Request for Admissions" to the birth mother. On October 8, 1996, in the Pinellas County Circuit Court, the father filed a "Memorandum of Law." On October 16, 1996, in the Pinellas County Circuit Court, the father filed a "Subpoena *712 Duces Tecum Without Deposition" to Gift of Life Adoption Services.
On October 18, 1996, the Pinellas County Circuit Court stayed the father's paternity and custody action pending the resolution of ABC's and the prospective adoptive parents' actions in the Hillsborough County Circuit Court. On November 15, 1996, the Hillsborough County Circuit Court dismissed with prejudice the prospective adoptive parents' declaratory judgment action on the grounds that they lacked standing and that the issue of prebirth abandonment was more appropriate in an adoption proceeding. The prospective adoptive parents appealed the dismissal of their declaratory judgment action to the District Court of Appeal of Florida, Second Circuit.
On November 25, 1996, in the Pinellas County Circuit Court, the father filed an "Emergency Motion for Temporary Custody," an "Amended Emergency Motion for Temporary Custody," and a "Notice of Hearing." On November 27, 1996, following a hearing, the Pinellas County Circuit Court entered an emergency temporary custody order finding ABC to be Baby Boy G.'s legal guardian, awarding the father temporary custody of Baby Boy G., ordering ABC to retrieve Baby Boy G. from the prospective adoptive parents, and ordering ABC to deliver Baby Boy G. to the father. The prospective adoptive parents were anonymously represented by counsel at the hearing, although they had not attempted to intervene in the father's paternity and custody action.
On December 2, 1996, in the Pinellas County Circuit Court, the father filed an "Amended Emergency Motion for Temporary Custody" and a "Notice of Hearing." The Pinellas County Circuit Court entered an order granting the father temporary custody of Baby Boy G. and an order "Reinstating Proceedings." On that same day, the Hillsborough County Circuit Court dismissed ABC's petition to terminate the father's parental rights and denied the prospective adoptive parents' motion to intervene. ABC did not appeal the dismissal. The prospective adoptive parents appealed the denial of their motion to intervene in ABC's action. On December 3, 1996, in the Pinellas County Circuit Court, the father filed a "Notice of Hearing." On December 13, 1996, in the Pinellas County Circuit Court, the father filed a "Notice of Filing."
On December 16, 1996, in the Tuscaloosa County Circuit Court, ABC filed a motion seeking full-faith-and-credit enforcement of the November 27, 1996, emergency temporary custody order of the Pinellas County Circuit Court in order for ABC to comply with the requirement that it retrieve Baby Boy G. from the prospective adoptive parents and return him to his father.
On January 3, 1997, the Pinellas Court Circuit Court granted the father custody of Baby Boy G., pending further order of the court. On January 8, 1997, in the Pinellas County Circuit Court, E.V., the then current wife of the father, filed a "Petition for Adoption" to adopt Baby Boy G., and the father filed a consent so that he and his then current wife would be Baby Boy G.'s parents. On January 13, 1997, the prospective adoptive parents moved to intervene in the Tuscaloosa County Circuit Court action. On January 21, 1997, the Tuscaloosa County Circuit Court granted the motion to intervene and appointed a guardian ad litem to represent the interests of Baby Boy G. On January 22, 1997, the prospective adoptive parents filed an adoption action in the Tuscaloosa County Probate Court. At this time, for the first time, the father learned where Baby Boy G. lived and who had physical custody of Baby Boy G. The Tuscaloosa County Probate Court transferred the prospective adoptive parents' adoption action, *713 pursuant to § 26-10A-24(e), Ala.Code 1975, to the Tuscaloosa County Juvenile Court. Once the father learned that the prospective adoptive parents had custody of Baby Boy G., the father attempted to see Baby Boy G. and to send him gifts. However, the prospective adoptive parents rebuffed his overtures.
On January 24, 1997, in the Pinellas County Circuit Court, the father filed a "Motion to Compel Production of Documents." On February 10, 1997, in the Pinellas County Circuit Court, the father filed a "Motion for Disqualification of Counsel" and a "Motion to Strike the Objection to Third Party Subpoena of Dr. Matthew Conrad and Motion for Protective Order." On February 17, 1997, in the Pinellas County Circuit Court, the father filed an "Amended Motion to Compel Production of Documents" and a "Notice of Hearing." On March 10, 1997, in the Pinellas County Circuit Court, the father filed a "Notice of Taking Deposition Duces Tecum" to the medical records custodian of Helen Ellis Hospital, to Dr. Matthew Conrad, and to the custodian of records for ABC. In the Tuscaloosa County Probate Court, the father filed a motion to dismiss and an objection to the prospective adoptive parents' adoption action. On March 18, 1997, in the Pinellas County Circuit Court, the father filed a "Subpoena Duces Tecum" to the custodian of records for Helen Ellis Hospital, to Dr. Matthew Conrad, and to the custodian of records for ABC.
On April 1, 1997, in the Tuscaloosa County Circuit Court, the father filed a motion to give full faith and credit to the November 27, 1996, and January 3, 1997, orders of the Pinellas County Circuit Court. On April 10, 1997, in the Tuscaloosa County Circuit Court, the father filed a "Memorandum of Law and Facts" in support of his motion to give full faith and credit to the Pinellas County Circuit Court's custody orders. On April 15, 1997, the Tuscaloosa County Circuit Court denied ABC's motion for full-faith-and-credit enforcement of the November 27, 1996, emergency temporary custody order entered by the Pinellas County Circuit Court. The Tuscaloosa County Circuit Court held that the Pinellas County Circuit Court lacked jurisdiction to enter the November 27, 1996, emergency temporary custody order. Additionally, the Tuscaloosa County Circuit Court ordered DNA testing to determine the parentage of Baby Boy G. and awarded the prospective adoptive parents temporary custody of Baby Boy G.
On June 3, 1997, in the Tuscaloosa County Circuit Court, the father filed a "Motion for Stay of Proceedings Pending Appeal of Interlocutory Order" of April 15, 1997. In July 1997, the father petitioned the Court of Civil Appeals for a writ of mandamus ordering the Tuscaloosa County Circuit Court to give full-faith-and-credit enforcement to the November 27, 1996, emergency temporary custody order of the Pinellas County Circuit Court. On July 30, 1997, the Pinellas County Circuit Court entered an order declining to continue exercising jurisdiction over the father's paternity and custody action.
In September 1997, in the Court of Civil Appeals, the father filed a reply brief. On October 9, 1997, in the Tuscaloosa County Circuit Court, the father filed a "Motion for Protective Order" and a letter brief in support of the motion. On October 17, 1997, in the Tuscaloosa County Juvenile Court, the prospective adoptive parents petitioned the court to terminate the parental rights of the birth mother and the father. As grounds for the termination of the father's parental rights, the prospective adoptive parents asserted that the father had abandoned Baby Boy G. and had *714 committed "other egregious actions against the birth mother." Upon the prospective adoptive parents' motion, the actions in the Tuscaloosa County Circuit Court, the Tuscaloosa County Juvenile Court, and the Tuscaloosa County Probate Court were consolidated into one action in the Tuscaloosa County Circuit Court.
On November 5, 1997, the District Court of Appeal of Florida, Second Circuit, issued an opinion affirming the dismissal of the prospective adoptive parents' declaratory judgment action and the denial of their motion to intervene in ABC's action to terminate the parental rights of the father in the Hillsborough County Circuit Court. The Florida District Court of Appeal agreed with the two Hillsborough County Circuit Court judges that the prospective adoptive parents lacked standing (1) to bring the declaratory judgment action to determine the consent of the father and (2) to intervene in ABC's action to terminate the parental rights of the father. On November 7, 1997, the Alabama Court of Civil Appeals denied the father's petition for a writ of mandamus on the ground that the Pinellas County Circuit Court had declined jurisdiction over the father's paternity and custody petition. Ex parte C.V., 707 So.2d 249 (Ala.Civ.App.1997).
On February 24, 1998, the Tuscaloosa County Circuit Court permitted the prospective adoptive parents, over the objection of the father, to amend their petition to terminate the father's parental rights. In March 1998, in the Tuscaloosa Juvenile Court, the father filed a "Pre-trial Brief of Father ... Regarding Relevancy of Pre-Birth Conduct." From March 9 through March 12, 1998, in the Tuscaloosa County Circuit Court, the father attended the trial. On April 13, 1998, in the Tuscaloosa County Juvenile Court, the father filed a "Post-trial Brief." On April 28, 1998, the Tuscaloosa County Circuit Court terminated the parental rights of the birth mother and the father. The court stated:
"The Court is now presented with the challenge to correctly and fairly apply the Alabama laws regarding adoptions and termination of parental rights to the facts particular to this case. Furthermore, all attorneys acknowledge, that there has been one issue raised (the issue of whether or not a biological father can abandon his child prior to the child's birth for purposes of vitiating his consent for adoption) which has apparently not been previously addressed by an appellate court of this state. In order to reach its conclusions and render a final decision on the merits, it is incumbent upon this Court to make a determination as to exactly the basis of the [prospective adoptive parents'] request for relief and further, to make extensive findings of fact from the evidence presented.
"SUMMARY OF LEGAL ARGUMENTS
"1. [The prospective adoptive parents] acknowledge that they must meet their burden of proof by providing clear and convincing evidence to the Court in support of their positions.
"2. [The prospective adoptive parents] basically assert two legal theories in support of their requested relief that this Court approve their petition for the adoption of Baby Boy [G.]. In summary, those legal theories are as follows:
"(A) That [the father's] consent for adoption pursuant to [§ 26-10A-7, Ala.Code 1975] is either implied based upon his alleged actions as they regard [Baby Boy G.], or that this consent is no longer necessary in the facts of this case. In support of this legal position, the [prospective adoptive parents'] assert that evidence regarding *715 [the father's] alleged prebirth abandonment is relevant to prove abandonment of [Baby Boy G.] pursuant to the Alabama laws regarding adoptions, and therefore, his consent is not required or implied.
"The attorneys for the [prospective adoptive parents] acknowledge that no Alabama appellate court has previously recognized their theory of pre-birth abandonment. They cite to the Court two Florida Supreme Court cases as the primary basis for this theory: [The Adoption of Doe], 543 So.2d 741 (Fla.1989), and [The Adoption of Baby E.A.W.], 658 So.2d 961 (Fla.1995).
"(B) Alternatively, the [prospective adoptive parents] assert that [the father's] parental rights are due to be terminated by this Court pursuant to [§ 26-18-7, Ala.Code 1975].
"3. [The guardian ad litem] also asserts these legal theories in support of her position on behalf of the [Baby Boy G.].
"4. [The father] asserts in response to the [prospective adoptive parents'] claims that pre-birth abandonment is not recognized under the current [law] of Alabama. Additionally, [the father] asserts that the [prospective adoptive parents] cannot meet the burden of proof required to terminate his parental rights and allow the adoption to proceed.
". . . .
"FINDINGS OF FACT
"1. From the undisputed and the disputed evidence presented at trial, the Court hereby makes the following findings of fact. Pertinent facts as presented by [the father are] almost exactly opposite from [the birth mother's] version of the facts about relevant incidents. In resolving the questions of disputed facts, the Court has considered all relevant factors including, but not limited to, the motivation of the parties, the demeanor and presentation of the witnesses, and the ability or inability of the witnesses to recall with some degree of detail the various events. This is an ore tenus proceeding.
"2. Baby Boy [G.] was born on March 19, 1996 in the city of Tarpon Springs, County of Pinellas, State of Florida....
"3. After a careful review of the relevant adoption laws, the Court can find nothing which would prevent consideration of [the father's] pre-birth conduct in making a determination whether or not [the father] has `abandoned' Baby Boy [G.]. Furthermore, upon consideration and reflection of the Florida cases mentioned above, this Court cannot find any reason whatsoever why the logic used by the Florida Supreme Court would not be applicable to Alabama adoption cases....
". . . .
"5. Even without the finding by this Court that the requirement for [the father's] consent to the adoption by the [prospective adoptive parents] was not [sic] waived or implied by [the father's] conduct toward [the birth mother], there was ample evidence (clear and convincing) presented to allow this Court to conclude that [the father's] parental rights are otherwise due to be terminated. Clearly [the father's] actions have led to [Baby Boy G.] being a dependent child. Abandonment and the failure of [the father] to provide even minimal support and necessities also factor into this conclusion. Upon careful consideration of the expert trial testimony of Dr. James Calvert, the Court concludes that, under the fact[s] presented in this case, there is no alternative to the termination of [the father's] parental rights.

*716 "6. The Court finds that [the birth mother] has executed a consent for Baby Boy [G.] to be adopted by the [prospective adoptive parents]. Said consent was filed with the Probate Court of Tuscaloosa County, Alabama, as a [part] of the initial petition for adoption. [The father] has not consented to allow said adoption.
"7. The Court finds from the evidence that [the father] is, in fact, the biological father of Baby Boy [G.]. The genetics test results received into evidence are virtually conclusive on this issue.
"8. The Court finds that ... [the] Guardian ad litem ... strongly advocates that [the father's] parental rights as to Baby Boy [G.] should be terminated and that the child should be adopted by [the prospective adoptive parents].
"9. [ABC] has recommended that the [prospective adoptive parents] be allowed to adopt [Baby Boy G.] conditioned upon [the father's] rights being terminated. Furthermore, [ABC] has granted its consent for the adoption of [Baby Boy G.] by [the prospective adoptive parents].
"10. The Court finds that [the father] and [the birth mother] began seeing each other when she was 17 years old and he was 22. [The father] claims that he did not have sexual relations with [the birth mother] prior to her 18th birthday. At some point during 1995, [the father] and [the birth mother] began living together in an apartment leased to her mother. They found out that [the birth mother] was pregnant in the summer of 1995. Subsequently, [the father] gave [the birth mother] a check and told her to get an abortion. She tore the check up. In August 1995, [the father] and [the birth mother] moved into an apartment at Fifth Seasons apartments. The apartment lease was either in [the birth mother's] name or her mother's name. [The father's] mother helped them with the initial deposit on the apartment. Sometime in November 1995, [the father] moved out of the apartment with [the birth mother], taking virtually everything with him, including all furniture, (except a bed), the food, the dishes, the eating utensils, the sheets, the soap, and even the Christmas tree. Connie Going, a social worker for the Gift of Life Adoption [Services] verified that the apartment was empty when she visited on November 28, 1995. At that time Ms. Going's agency provided [the birth mother] some food. The Court finds that [the father] had very little contact with [the birth mother] after he moved out of the apartment.
"11. The Court finds from the evidence that [the father] totally abused and abandoned [the birth mother], physically, emotionally, and financially, during her pregnancy with Baby Boy [G.]. [The father] failed to provide any financial support for [the birth mother], although he testified he worked throughout most of the relationship. He did not pay apartment rent, he did not pay the utility bills, he did not pay any of [the birth mother's] prenatal medical bills, and he did not provide food and the basic necessities of life for the mother of his unborn child....
"12. The Court finds from the evidence that [the father] did not accompany [the birth mother] on her prenatal doctor visits. Social workers from the Gift of Life [Adoption Services] took [the birth mother] to virtually all of her appointments. [The father] paid no prenatal bills and did not pay any bills for the birth of [Baby Boy G.]. [The father] refused [the birth mother's] request for assistance. [The father] refused to allow *717 [the birth mother] to allow his name to be listed as [Baby Boy G.'s] father on her application for Medicaid benefits. [The father] took no financial responsibility for the [birth] mother ... or [Baby Boy G.].
"13. The Court finds from the evidence that [the father] physically abused [the birth mother] while she was pregnant on several occasions. [The birth mother] was afraid of [the father] for herself and [Baby Boy G.]. There were at least two incidents in which the police were called after an altercation between [the father] and [the birth mother]. On August 20, 1995, [the father] was arrested on felony charges of aggravated battery and false imprisonment of [the birth mother]. On that occasion, [the birth mother] suffered a busted lip, bruises, and a dislocated shoulder. The charges against [the father] were apparently never prosecuted. There were other times when [the father] physically abused [the birth mother] throughout the course of their relationship.
"14. Less than a month after another physical altercation in which the police were called, [the father] left [the birth mother] a note on February 11, 1996, which proposed marriage. This note was left at a time when [the father] was dating his present wife, [E.V.], and just three days before he proposed to [E.V.]. At some time during his relationship with [the birth mother], they had been engaged. When that engagement ended, [the father] took the engagement ring he had given the [birth mother] from her. He subsequently gave the same ring to his present wife, [E.V.]. [The father] and [E.V.] were married in June 1996. They now have a son together.
"15. The Court finds that the Gift of Life Adoption [Services] became involved with [the birth mother] in mid October 1995. [The father] knew about Gift of Life [Adoption Services] prior to the time he acknowledged receipt of a letter from Gift of Life [Adoption Services]. [The father] initiated little or no contact with Gift of Life [Adoption Services]. [The father] knew the approximate birth date of [Baby Boy G.]. He did not attempt to attend the delivery. [The father] knew that [the birth mother] had made plans for the adoption of the child.
"16. It is undisputed that [the birth mother] lied to [ABC] when she became involved with them for purposes of placing the child for adoption. She signed a sworn affidavit on March 20, 1996, that the identity and whereabouts of the biological father were unknown. In April 1996, [the birth mother] lied to [the father] when she told him that the child had died at birth. [The father] did make attempts to find out about the alleged death of [Baby Boy G.]. [The father] hired an attorney ... sometime prior to April 10, 1996, to file a petition to determine paternity against [the birth mother]. Such a petition was filed on or about April 10, 1996, in Pinellas County, Florida. [The father] did not find out that [Baby Boy G.] was alive until the first court appearance before [the Pinellas County Circuit Court].
"17. [The father] had paid no support to the [prospective adoptive parents] the entire time they have had [Baby Boy G.]. He has not paid for any of [Baby Boy G.'s] medical bills nor provided any other elements of financial support for [Baby Boy G.]. He has not even attempted to do so. [The father] had made no formal requests for visitation in this matter. In summary, the Court cannot discern from the evidence, even one thing [the father] had done to attempt to support [the birth mother] *718 during the pregnancy nor [Baby Boy G.] after he was born. The Court does find that [the father] has made vigorous legal efforts to gain custody after the fact.
"18. The Court finds that [the father] has now married and that he and his wife, [E.V.], have a son who resides with them. [The father] and his wife appear to provide adequate parenting to their child.

"CONCLUSIONS
". . . .
"Clearly, upon the evidence presented, it would amount to a violation of Baby Boy [G.'s] constitutional due process rights to remove him from the only home and only parents he has ever known solely on the basis of biology. As stated by Dr. Calvert, to remove the child from the [prospective adoptive parents'] home at this point in time would be tantamount to the psychological trauma he would experience from the death of both of his parents. The [prospective adoptive parents] have become this child's parents. To deny the child the benefit of his relationship without some substantial rational basis is a violation of his constitutional rights.
"ORDERS
"IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:
"(1) The Court finds from clear and convincing evidence that [the father's] conduct as it relates to [Baby Boy G.] and to the birth mother prior to and after [Baby Boy G.'s] birth constitutes abandonment as defined in the Alabama Adoption Code. Therefore, [the father's] consent for the adoption of Baby Boy [G.] is either implied or not required.
"(2) The Court finds from clear and convincing evidence that there is ample evidence to meet the two-pronged test set forth in Ex parte Beasley [, 564 So.2d 950 (Ala.1990)], in order for the Court to grant the [prospective adoptive parents'] petition to terminate [the father's] parental rights. The Court finds that [Baby Boy G.] is dependent and that all viable alternatives to a termination of parental rights have been considered and excluded. Furthermore, the Court finds that said termination of parental rights is consistent with the welfare and best interest of said minor child.
"(3) The Court further finds from clear and convincing evidence that constitutional due process considerations on behalf of [Baby Boy G.] clearly dictate that [the father's] parental rights should be terminated and the child permanently placed with [the prospective adoptive parents]."
(Emphasis added.) The Tuscaloosa County Circuit Court granted the prospective adoptive parents' petition for adoption and ordered the prospective adoptive parents and the father jointly to pay the guardian ad litem a fee of $9,850.
On May 11, 1998, the father appealed the judgment of the Tuscaloosa County Circuit Court to the Alabama Court of Civil Appeals. On February 12, 1999, the Court of Civil Appeals affirmed the judgment of Tuscaloosa County Circuit Court. C.V. v. J.M.J., 810 So.2d 692 (Ala.Civ.App. 1999). Although recognizing that there is no statutory authority in Alabama for prebirth abandonment as a ground for the termination of parental rights, the Court of Civil Appeals specifically held that the trial court properly had considered the father's actions or inactions before the birth of Baby Boy G. in determining that the father had abandoned Baby Boy G. and that he had impliedly consented to the adoption of Baby Boy G. On February 26, 1999, the *719 father applied to the Court of Civil Appeals for rehearing. The Court of Civil Appeals denied the father's application for rehearing on April 30, 1999, with an opinion. On May 14, 1999, the father petitioned this Court for a writ of certiorari.
Findings of fact based on ore tenus evidence are presumed correct, and a judgment based on those findings of fact will not be reversed unless it is clearly erroneous, manifestly unjust, without supporting evidence, or against the great weight of the evidence. Odom v. Hull, 658 So.2d 442 (Ala.1995). The reason for this tenet of the law, the ore tenus rule, is that the trial judge who sees and hears a witness testifying in person in court can better judge the credibility of the witness than a reviewing appellate court can judge the credibility from only the typed words in the transcript. Ex parte Walters, 580 So.2d 1352 (Ala.1991). An appellate court reviewing a record that contains a witness's deposition is as able as the trial judge to find facts from the deposition. See Muscogee Construction Co. v. Peoples Bank & Trust Co., 286 Ala. 258, 238 So.2d 883 (1970), and Carnegie v. Carnegie, 261 Ala. 146, 73 So.2d 556 (1954). Thus, the ore tenus rule does not apply to findings of fact based on testimony contained in the witness's deposition and not orally presented to the trial judge by the witness in person. Smith v. Cook, 220 Ala. 338, 124 So. 898, 900 (1929). See also Eldridge v. Loftis, 723 So.2d 562 (Ala.1998); Hamrick v. City of Albertville, 238 Ala. 82, 189 So. 545 (1939); Burleson v. Clark, 232 Ala. 119, 167 So. 263 (1936); Taylor v. Cowart, 228 Ala. 317, 153 So. 403 (1934); Jones v. Stollenwerck, 218 Ala. 637, 119 So. 844 (1928). "[I]n deciding appeals, no weight shall be given the decision of the trial judge upon the facts where evidence is not taken orally before the judge, but in such cases the Supreme Court shall weight the evidence and give judgment as it deems just." § 12-2-7(1), Ala.Code 1975. While the trial judge in this case accepted virtually entirely all of the birth mother's accusations against the father, these findings are not presumed correct inasmuch as they are based only on the birth mother's deposition testimony. She did not testify in person before the trial judge. A second limitation on the ore tenus rule is that it does not apply to rulings on questions of law. Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994).
A parent has a fundamental liberty interest in the care, custody, and management of his or her child. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944). "`The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, ... [262 U.S. 390] at 399 [43 S.Ct. 625, 67 L.Ed. 1042 (1923)] ..., the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, ... [316 U.S. 535] at 541 [62 S.Ct. 1110, 86 L.Ed. 1655 (1942)]..., and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496 [85 S.Ct. 1678, 14 L.Ed.2d 510] ... [(1965)] (Goldberg, J., concurring).'" Hodgson v. Minnesota, 497 U.S. 417, 447-48, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)).

Choice of Law
Both the prospective adoptive parents and the trial court chose to apply Alabama law. The father does not challenge their *720 choice of law. The prospective adoptive parents, the trial court, and the Court of Civil Appeals found Florida caselaw persuasive, but not controlling, on the issue of prebirth abandonment.
Alabama law is controlling in this case. See Fitts v. Minnesota Mining & Mfg. Co., 581 So.2d 819 (Ala.1991). Moreover, for the purpose of interpreting Alabama statutory law, Florida caselaw is not persuasive on the issue whether prebirth abandonment can be a ground for consent to an adoption. The Florida cases cited by the prospective adoptive parents, the trial court, and the Court of Civil Appeals are Adoption of Baby E.A.W., 658 So.2d 961 (Fla.1995), and Adoption of Doe, 543 So.2d 741 (Fla.1989). In Adoption of Doe, the Florida Supreme Court interpreted the statutory term "abandoned," defined in the Florida Adoption Code, to permit the Florida judges in an adoption proceeding to consider a father's prebirth conduct toward the mother as a factor in determining whether the father had abandoned his child. The Florida Legislature subsequently codified the Florida Supreme Court's interpretation into the Adoption Code. See Fla.Stat.Ann. § 63.032(14) (West.Supp.1997). In Adoption of Baby E.A.W., supra, the Florida Supreme Court relied upon § 63.032(14) in affirming the judgment of the trial court finding that the father had abandoned his child. Florida statutory criteria are not persuasive in interpreting differently written Alabama statutes regarding abandonment by a parent. Therefore, the controlling issues in this case are whether in 1997 Alabama recognized "prebirth abandonment" by a father as a ground for terminating parental rights and whether in 1997 Alabama recognized "prebirth abandonment" by a father as implied consent to adoption of his child or as relinquishment of his parental rights.

Termination of Parental Rights
As a common-law state, Alabama follows the English common law that is not inconsistent with the Constitution and the laws of this State. § 1-3-1, Ala.Code 1975. "Proceedings to terminate parental rights were unknown at common law. In re Zink, 264 Minn. 500, 119 N.W.2d 731 (1963). Therefore, termination proceedings are purely statutory." In the Matter of the Termination of Parental Rights of P.A.M., 505 N.W.2d 395, 397 (S.D.1993). See also Carroll County Dep't of Social Servs. v. Edelmann, 320 Md. 150, 577 A.2d 14 (1990); In the Matter of McDuel, 142 Mich.App. 479, 369 N.W.2d 912 (1985); Petition of Sherman, 241 Minn. 447, 63 N.W.2d 573 (1954); S.K.L. v. Smith, 480 S.W.2d 119 (Mo.Ct.App.1972); D.J.A. v. Smith, 477 S.W.2d 718 (Mo.Ct.App.1972); A.E. v. State, 743 P.2d 1041 (Okla.1987); In the Matter of Edmunds, 560 P.2d 243 (Okla.Ct.App.1977); In re A.A., 134 Vt. 41, 349 A.2d 230 (1975); Church v. Church, 24 Va.App. 502, 483 S.E.2d 498 (1997); Willis v. Gamez, 20 Va.App. 75, 455 S.E.2d 274 (1995). Because the termination of parental rights is purely statutory, statutes governing the termination of parental rights must be strictly construed. See Ex parte Sullivan, 407 So.2d 559, 563 (Ala.1981).
"[T]he primary focus of a court in cases involving the termination of parental rights is to protect the welfare of children and at the same time to protect the rights of their parents." Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). See § 26-18-7(a)(1), Ala.Code 1975. Termination of parental rights is a drastic measure and once done cannot be undone. "[A] court should terminate parental rights only in the most egregious of circumstances. Moreover, the age-old principle that, as against a challenge by a nonparent, a parent who is neither unfit nor guilty of forfeiting his or her parental rights is entitled to custody *721 has been strengthened rather than weakened by the 1984 adoption of the Uniform Child Protection Act[, § 26-18-1 et seq., Ala.Code 1975]." Ex parte Beasley, 564 So.2d at 952.
When a nonparent is the petitioner seeking to terminate the parental rights of a parent, the petitioner must present clear and convincing evidence that (1) the child is dependent, (2) one of the grounds in § 26-18-7 exists, and (3) no viable alternative to termination of the parental rights exists. Ex parte Beasley, supra. Clear and convincing evidence is
"[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
§ 6-11-20(4), Ala.Code 1975 (emphasis added).
"In viewing the `dependency' issue in the context of [a nonparent's] attempt to terminate parental rights, the [nonparent] would have standing only where both parents are found to be unfit or otherwise unable to discharge the responsibilities of parenthood." Ex parte Beasley, 564 So.2d at 954 (emphasis added). The Tuscaloosa County Circuit Court considered the father's prebirth conduct in determining Baby Boy G. to be a dependent child. In January 1997, the Alabama Legislature had not enacted a statute requiring a putative father to support his unborn child and authorizing Alabama courts to consider the putative father's prebirth support or lack thereof in determining whether the father had abandoned his child.[7] At that time, a putative father owed no duty of support to a child until his paternity of the child had been established. Ex parte State of California, 669 So.2d 884 (Ala.1995). See Keener v. State, 347 So.2d 398 (Ala.1977), Upton v. State, 255 Ala. 594, 52 So.2d 824 (1951), and Law v. State, 238 Ala. 428, 191 So. 803 (1939). Therefore, the father did not owe a duty to support Baby Boy G. until the Tuscaloosa County Circuit Court established his paternity as to Baby Boy G., when that court simultaneously terminated his parental rights! Noteworthily, the July 9, July 10, and November 27, 1996 orders of the Pinellas County Circuit Court in favor of the father were interlocutory only, and never final.
Moreover, because the prospective adoptive parents hid their identity in the various Florida court proceedings, the father did not learn where Baby Boy G. lived or who had physical custody of Baby Boy G. until January 1997, when the prospective adoptive parents dropped their shield of anonymity and petitioned the Tuscaloosa County courts to terminate the father's parental rights and to grant their adoption of Baby Boy G. To penalize the father for not providing support to the prospective adoptive parents for Baby Boy G. while the prospective adoptive parents were hiding their identities and address and were hiding Baby Boy G. himself would violate the spirit of the "clean hands" doctrine. J & M Bail Bonding Co. v. Hayes, 748 So.2d 198, 199 (Ala.1999) ("The purpose of the clean hands doctrine is to prevent a party from asserting his, her, or its rights under the law when the party's own wrongful conduct renders the assertion of such legal *722 rights `contrary to equity and good conscience.'" (quoting Draughon v. General Fin. Credit Corp., 362 So.2d 880, 884 (Ala. 1978))). To penalize the father for failing to contribute support to the prospective adoptive parents after they revealed themselves and Baby Boy G. but while they did their utmost to deny and to terminate the father's parental rights would be equally unfair.
Additionally, once prospective adoptive parents have received an adoptee into their home and have filed a petition for adoption, a court "shall [enter an interlocutory order] delegating to the [prospective adoptive parents] (1) custody, except custody shall be retained by ... the licensed child placing agency which held custody at the time of the placement until the entry of the final decree and (2) the responsibility for the care, maintenance, and support of the adoptee, including any necessary medical or surgical treatment, pending further order of the court." § 26-10A-18. Therefore, once the prospective adoptive parents petitioned to adopt Baby Boy G. they assumed responsibility for his care and support, and, thus, relieved the father of any duty of support.
Finally on the issue of dependency, while the father's prebirth conduct toward the birth mother and his alleged lack of financial support for the birth mother could have been relevant to the father's fitness as a parent, the prospective adoptive parents did not allege, and the Tuscaloosa County Circuit Court did not find, the father to be unfit. Therefore, the Tuscaloosa County Circuit Court's finding of dependency, the first sine qua non for termination of parental rights according to Ex parte Beasley, supra, is not supported by clear and convincing evidence. I will, nonetheless, examine the issue of the second Ex parte Beasley sine qua non, the existence, vel non, of grounds for termination of the father's parental rights.
"The Legislature ... [in § 26-18-7, Ala. Code 1975] has established specifically the grounds upon which a court must base any order to terminate parental rights." Ex parte Beasley, 564 So.2d at 953. At the time material to this case, those grounds, contained in the Child Protection Act, were:[8]
"(a) If the court finds from clear and convincing evidence, competent, material and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, as herein defined;

"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for the needs of the child;
"(3) That the parent has tortured, abused, cruelly beaten or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat or otherwise *723 maltreat the child, or the said child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling;
"(4) Conviction of and imprisonment for a felony;
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent;
"(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent;
"(3) Failure by the parents to maintain consistent contact or communication with the child;
"(4) Lack of effort by the parent to adjust his circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.
"(c) In any case where the parents have abandoned a child as herein described and such abandonment continues for a period of six months next preceding the filing of the petition, such facts shall constitute a rebuttable presumption that the parents are unable or unwilling to act as parents."

§ 26-18-7, Ala.Code 1975 (emphasis added). The order terminating the father's parental rights relies on the ground of abandonment.
The prospective adoptive parents assert that the father abandoned Baby Boy G. and the birth mother by neglecting and abusing the birth mother, by failing to provide financial support to the birth mother before the birth of Baby Boy G., and by failing to provide support to the prospective adoptive parents for Baby Boy G. They assert also that the father's abandonment continued "for a period of six months next preceding the filing of [their adoption] petition." Abandonment, as defined by the Child Protection Act, is
"[a] voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
§ 26-18-3(1) (emphasis added). This definition does not contemplate abandonment of an unborn child by a father, because a father cannot have custody of the unborn child. Simply put, § 26-18-7(a)(1) does not authorize a trial court to terminate parental rights for "prebirth abandonment" by a father. While the father's prebirth conduct towards the birth mother and his alleged lack of financial support of *724 the birth mother could have been relevant to his fitness as a parent, the father's prebirth conduct toward the birth mother was not relevant to whether the father abandoned Baby Boy G., a child. Moreover, the prospective adoptive parents did not prove that the father intentionally and voluntarily relinquished his rights to Baby Boy G. after Baby Boy G.'s birth. Indeed, the evidence of the father's continual efforts to find and to recover his child is compelling. Therefore, the prospective adoptive parents failed to prove by clear and convincing evidence that the father had abandoned Baby Boy G. A fortiori, I agree with several of my colleagues on this Court insofar as they observe in their special writings that the evidence in this case cannot support the conclusion that any abandonment by the father "continue[d] for a period of six months next preceding the [prospective adoptive parents'] filing of the petition" (§ 26-18-7(c) quoted above) so as to terminate the father's parental rights, as the Child Protection Act would require for the termination of the father's parental rights.
Finally, the record does not support a finding of the third and last Ex parte Beasley sine qua non for the termination of parental rightsthat no viable alternative to the termination of parental rights exists. The obvious alternative in this case is simply not to terminate the father's parental rights and to return this child to his natural father. The trial court in the case before us did not find the father unfit. Indeed, the termination order specifically
"finds that [the father] has now married and that he and his wife have a son who resides with them. [The father] and his wife appear to provide adequate parenting to their child."
In Ex parte D.J., 645 So.2d 303, 305 (Ala. 1994), this Court stated:
"I. Parental Presumption
"The courts of this state, in accord with the common law, have long presumed that the entrustment of children to the care and custody of their natural parents serves the best interests of the children. For example, in Striplin v. Ware, 36 Ala. 87, 89-90 (1860), this Court explained:
"`The law devolves the custody of infant children upon their parents, not so much upon the ground of natural right in the latter, as because the interests of the children, and the good of the public, will, as a general rule, be thereby promoted. It is a fair presumption, that so long as children are under the control of their parents, they will be treated with affection, and their education and morals will be duly cared for.
"`... So strong is the presumption, that "the care which is prompted by the parental instinct, and responded to by filial affection, is most valuable of all"; and so great is the reluctance of the court to separate a child of tender years from those who according to the ordinary laws of nature, must feel the greatest affection for it, and take the deepest interest in its welfarethat the parental authority will not be interfered with, except in case of gross misconduct or where, from some other cause, the parent wants either the capacity or the means for the proper nurture and training of the child.' [(Emphasis added.)]
"See also Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983) (`The prima facie right of a natural parent to the custody of his... child, as against the right of custody in a nonparent, is grounded in the common law concept that this primary parental right ... is in the best interest *725 ... of the child as a matter of law' [emphasis in Mathews]); Ex parte Berryhill, 410 So.2d 416 (Ala.1982); Ex parte Sullivan, 407 So.2d 559, 563-64 (Ala.1981) (`The law recognizes that a higher authority ordains natural parenthood, and a fallible judge should disturb the relationship thus established only where circumstances compel human intervention'); Harris v. Harris, 251 Ala. 687, 39 So.2d 232 (1949); Chandler v. Whatley, 238 Ala. 206, 189 So. 751 (1939) (`The law, indulging the presumption that the welfare of [the] child will be best conserved by awarding her custody to her father, rather than the step-father, ordains that this shall be done, unless such presumption is overcome by clear and convincing evidence that the father is ... unfit' [(Emphasis added.)]); Stoddard v. Bruner, 217 Ala. 207, 115 So. 252 (1928). These cases thus reveal not only the antiquity of the rule followed in this state but also the policy and rationale underlying the parental presumption."
Because none of the three Ex parte Beasley sine qua nons for termination of the father's parental rights exists, the Child Protection Act does not provide authority for the judgment of the trial court.

Implied Consent to Adoption
"`Adoption is not merely an arrangement between the natural parents and adoptive parents, but is a status created by the state acting as parens patriae, the sovereign parent. Because the exercise of sovereign power involved in adoption curtails the fundamental rights of the natural parent[s], the adoption statutes must be closely adhered to.'" Ex parte Sullivan, 407 So.2d 559, 563 (Ala.1981) (quoting Davis v. Turner, 337 So.2d 355, 360-61 (Ala.Civ.App.1976)). "Adoption is strictly statutory.... Being unknown at common law, it cannot be achieved by contract...." Id.
According to the Alabama Adoption Code, a parent may impliedly consent to an adoption or may relinquish of his or her parental rights by:
"(1) Leaving the adoptee without provision for his or her identification for a period of 30 days; or
"(2) Knowingly leaving the adoptee with others without provision for support and without communication, or not otherwise maintaining a significant parental relationship with the adoptee for a period of six months; or
"(3) Receiving notification of the pendency of the adoption proceedings under Section 26-10A-17 and failing to answer or otherwise respond to the petition within 30 days."
§ 26-10A-9, Ala.Code 1975, as it read before the amendment effective June 11, 1999.[9] The term adoptee connotes a born child capable of being adopted.
The prospective adoptive parents assert that the father impliedly consented to the adoption of Baby Boy G. by emotionally and financially abandoning the birth mother before the birth of Baby Boy G. While the father's prebirth conduct towards the birth mother and his alleged lack of financial support for the birth mother could have been relevant to a determination of his fitness as a parent, the father's prebirth conduct towards the birth mother was not relevant to determining whether the father abandoned Baby Boy G. § 26-10A-2(1), *726 Ala.Code 1975. The definition of the term "abandonment" in the Alabama Adoption Code, § 26-10A-1 et seq., Ala. Code 1975, differs from the definition in the 1984 Alabama Child Protection Act, § 26-18-3(1). Section 26-10A-2(1) in the Alabama Adoption Code defines abandonment as
"[a] voluntary and intentional relinquishment of the custody of a minor by a parent, or a withholding from the minor, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or the failure to perform the duties of a parent."
(Emphasis added.) A "minor" is "[a] person under the age of 19 years." § 26-10A-2(7). The only difference in the definitions of abandonment in § 28-18-3(1), as previously quoted, and § 26-10A-2(1) is that § 26-10A-2(1) uses the term "minor" rather than "child." The definition of a minor clearly envisions a child who has been born. Because adoption in Alabama is purely statutory, statutes governing adoption must be strictly enforced. Ex parte Sullivan, supra. Thus, the prebirth conduct of the father toward the birth mother was not a ground under § 26-10A-9, as it read before the amendments effective June 11, 1999, for implying consent to an adoption.
Nor does the father's post-birth conduct meet any of the criteria for implied consent stated by the plain language of the applicable version of § 26-10A-9 quoted above. The father did not leave Baby Boy G. without provision for his identification for 30 days. § 26-10A-9(1). Rather, the father filed his paternity and custody action less than 30 days after Baby Boy G.'s birth. The father did not "knowingly" leave Baby Boy G. with the prospective adoptive parents "without provision for support and without communication, or [did] not otherwise maintain[ ] a significant parental relationship" with Baby Boy G. "for a period of six months." § 26-10A-9(2), as it read before the amendment effective June 11, 1999. The father did not learn the identity of the prospective adoptive parents and thus the whereabouts of Baby Boy G. until January 1997. As previously stated, once the prospective adoptive parents filed their adoption petition, they assumed a duty to support Baby Boy G., § 26-10A-18, and they actively rebuffed the father's efforts to establish a significant parental relationship once he located Baby Boy G. Further, since the birth of Baby Boy G., the father at all times vigorously pursued his parental rights. Finally, he did not fail "to answer or otherwise respond to the [adoption] petition within 30 days" after receiving notice. § 26-10A-9(3). Rather, he promptly and thoroughly opposed the petition.
Therefore, the prospective adoptive parents failed to present clear and convincing evidence that the father impliedly consented to Baby Boy G.'s adoption or that the father relinquished his parental rights to Baby Boy G. Moreover, even if prebirth conduct at the time of Baby Boy G.'s gestation could have constituted implied consent, and even if this father's prebirth conduct were to have constituted implied consent, I would concur with the special writings of several of my colleagues on this Court insofar as they opine that this father impliedly and effectively withdrew any such consent. Thus the Tuscaloosa County Circuit Court erred in holding that the father had impliedly consented to the adoption of Baby Boy G.

Conclusion
Accordingly, because the Tuscaloosa County Circuit Court erred in terminating the father's parental rights and in awarding *727 custody of Baby Boy G. to the prospective adoptive parents, and the Court of Civil Appeals erred in affirming the judgment of the Tuscaloosa County Circuit Court, we should, as we do, reverse its judgment. Because the evidence in this case does not tend to prove any of Alabama's applicable statutory criteria for terminating the father's parental rights, we should, as we do, adjudge that C.V.'s parental rights as the father of Baby Boy G. are not terminated and remand this cause directly to the Tuscaloosa County Circuit Court for proceedings to determine the proper custody of Baby Boy G.
HOUSTON, Justice (dissenting from the rationale, and concurring in the result).
I dissented from the original opinion released on November 17, 2000. That opinion is withdrawn by the opinion released today. I now dissent from the rationale expressed in the per curiam opinion released today and concur in the rationale expressed by Justice Brown, Justice Woodall, and Justice Stuart in their special writings. I concur in the result.
Black's Law Dictionary 1011 (7th ed.1999) defines the word "minor" as a "child," and the word "child" is defined in Black's as a "baby or fetus" (p. 232).
BROWN, Justice (dissenting from the rationale and concurring in the result).
When the original opinion in this case was released on November 17, 2000, I dissented because I believed the Court of Civil Appeals had correctly quoted with approval the sentiment expressed by the Florida Supreme Court in In re: Adoption of Doe, 543 So.2d 741, 746 (Fla.1989). In that case, the Florida Court stated:
"Because prenatal care of the pregnant mother and unborn child is critical to the well-being of the child and of society, the biological father, wed or unwed, has a responsibility to provide support during the prebirth period. Respondent natural father's argument that he has no parental responsibility prior to birth and that his failure to provide prebirth support is irrelevant to the issue of abandonment is not a norm that society is prepared to recognize. Such an argument is legally, morally, and socially indefensible."
543 So.2d at 746.
I believe there was ample evidence before the trial court to support the trial court's factual finding that the natural father had abused and abandoned the birth mother during her pregnancy.
I dissent from the rationale of the main opinion and concur only in the result.
WOODALL, Justice (concurring in the result and dissenting from the rationale).
This matter is before us on application for rehearing. I was not a member of this Court when the opinion of November 17, 2000, was released. If I had been a member, I would have dissented. In my opinion, this Court should hold as follows:
1. That a parent has a duty to provide prebirth support to an unborn child;
2. That a parent's failure to perform that duty constitutes "abandonment" under the Alabama Child Protection Act;
3. That such "abandonment" terminates that parent's rights with reference to his or her child, by operation of law, in accordance with the Alabama Child Protection Act;
4. That such termination of parental rights negates the need for that parent's consent to the adoption of that child, pursuant to § 26-10A-10(1), Ala.Code 1975;
5. That in this case, this Court is bound by the trial court's factual finding that C.V. "totally abused and abandoned *728 [the birth mother] physically, emotionally, and financially, during her pregnancy";
6. That that abuse and abandonment terminated C.V.'s rights with reference to the child, as a matter of law; and
7. That, therefore, the trial court did not err in concluding that C.V.'s consent to the adoption was not required. However, a majority of this Court does not agree with me.
The father has successfully contested the adoption. Therefore, the trial court, not this Court, must now determine the proper custody of the child according to the child's best interests. See Comment, § 26-10A-24, Ala.Code 1975. I have confidence in the trial court's ability to consider the father's rights and the child's best interests; therefore, I concur only in that part of this Court's judgment remanding the case to the trial court.
STUART, Justice (concurring in the result in part and dissenting in part).
On December 20, 2000, this Court ordered the parties to mediate their dispute. However, the parties have failed to resolve this matter through mediation, and it is again before this Court on application for rehearing.
I was not a member of this Court on November 17, 2000, when it released its opinion in this case. Had I been a member, I would have dissented. I now dissent from the part of the opinion reversing the Court of Civil Appeals' judgment affirming the trial court's order terminating C.V.'s parental rights and granting the adoption by the prospective adoptive parents. A majority of the Court does not agree; therefore, I concur only in the result.
I agree with those Justices who dissented from the original opinion, which included Justice Houston and Justice Brown, who continue to sit on this Court, that the judgment of the Alabama Court of Civil Appeals is correct. More specifically, I agree with Justice Houston that an unborn child is a child and that because a "minor" is defined as a "child," an unborn child is included within the definition of a minor.[10]
Three proceedings were consolidated in this action, a circuit court action seeking full faith and credit for an order of a Florida court, a probate court adoption proceeding, and a juvenile court termination-of-parental-rights proceeding. This consolidation has caused the case to be complex and confusing.
When a trial court is presented evidence ore tenus, its findings of fact are presumed correct, and its judgment based on those findings of fact will not be reversed unless it is clearly erroneous, manifestly unjust, without supporting evidence, or against the great weight of the evidence. Odom v. Hull, 658 So.2d 442 (Ala.1995). A plurality of this Court on November 17, 2000, found the ore tenus rule inapplicable, holding that, as a matter of law, the father's prebirth conduct toward the birth mother was not relevant to determining whether the father abandoned Baby Boy G. I respectfully disagree. C.V. intentionally and voluntarily relinquished his rights to Baby Boy G. when he failed to assert his rights and to accept his responsibility for the child and the child's mother before his birth.
C.V.'s prebirth conduct is relevant to the issue of abandonment by C.V., as the *729 Court of Civil Appeals correctly pointed out in its opinion. C.V. v. J.M.J., 810 So.2d 692, 699 (Ala.Civ.App.1999). The holdings of the Florida courts that a parent's prebirth conduct can constitute abandonment are persuasive and highly relevant; they governed C.V.'s conduct before his child's birth because the child was conceived and born in Florida.
We need not rely on Florida law, however, to conclude that a father can abandon a child before its birth. A look at the Alabama Uniform Parentage Act is instructive. Section 26-17-9(b), a part of that Act, provides that an action to determine paternity may be commenced upon the complaint of any female who is pregnant or who is the mother of a child. Likewise, other appropriate parties, including a putative father, may bring a paternity action before the birth of a child. Ala.Code 1975, § 26-17-6.
It is firmly established in this state that the marital status of the parents does not affect parental obligations. Ex parte Jones, 592 So.2d 608 (Ala.1991). Surely no one would argue that married parents have no obligation to, or responsibility for, their unborn children. Unmarried parents have the same obligations and responsibilities that we readily assume married parents have and will fulfill.
Justice See, in his special writing, notes that because a parent can expressly consent before the child's birth to a child's adoption (see Ala.Code 1975, § 26-10A-11(2), § 26-10A-13 (a)and(b)), a parent can likewise impliedly consent to the child's adoption before the child's birth. He also states that that implied consent, like express consent, can be withdrawn. (See, J., concurring specially, 810 So.2d at 703). Justice See states:
"The trial court found that C.V. had `abused and abandoned [the birth mother] physically, emotionally, and financially, during her pregnancy with [Baby Boy G.]' by failing to provide her any financial support, by physically abusing her during her pregnancy, and by moving out of the apartment where they lived and taking almost everything with him, including the food, the dishes, the Christmas tree (C.V. moved during the holiday season), and all the furniture except a bed. Although C.V. vigorously disputes this recitation of facts, the record contains sufficient evidence to support the trial court's findings. Because C.V.'s conduct before the birth of Baby Boy G. was inconsistent with accepting the responsibilities of fatherhood, it could be construed to constitute implied consent to the adoption. However, ... C.V.'s actions after he learned of the birth of his son clearly indicate his intent to withdraw his implied consent to the adoption."
810 So.2d at 706.
While Justice See finds C.V.'s prebirth conduct was inconsistent with his accepting the responsibilities of fatherhood and as constituting an implied consent to Baby Boy G.'s adoption (which consent Justice See believes is revocable), I find C.V.'s prebirth conduct relevant and persuasive evidence indicating that C.V. did not assume the responsibilities of a father and that he, therefore, relinquished his rights as a father. Thus, I believe his conduct acted as more than implied consent to adoption under § 26-10A-11; I believe it constituted abandonment as that term is defined in the 1984 Child Protection Act, § 26-18-1 et seq., Ala.Code 1975. Abandonment is defined in the Child Protection Act as: "[a] voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, *730 maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent or failure to perform the duties of a parent." Ala.Code 1975, § 26-18-3(1). Under the Child Protection Act, there is no requirement that the parent's conduct evidencing the relinquishment of his parental rights occur after the child's birth. This is true for abandonment as well as several other grounds enumerated in the Child Protection Act pursuant to which parental rights can, by operation of law, be terminated. These grounds include among others, the torture, abuse, beating, or maltreatment of a sibling, or the parent's conviction of, and imprisonment for, a felony. Ala.Code 1975, § 26-18-7(a)(3) and (a)(4). This conduct may occur before a child's birth and provide grounds for termination of parental rights by operation of law.
Section 26-18-7(c) provides a rebuttable presumption that where parents have abandoned a child and that abandonment continues for a period of six months next proceeding the filing of the petition to terminate parental rights, the parents are unable or unwilling to act as parents. This provision, however, does not limit the trial court's consideration to the parents' conduct only for the six months preceding the filing of the petition. The trial court may, and should, consider any and all relevant conduct.
The Court of Civil Appeals has held that the trial court may consider evidence of past conduct and family history as well as present circumstances in determining whether to terminate parental rights. Unsuccessful attempts to abort a child have been considered evidence supporting a termination of parental rights. Brand v. Alabama Dep't of Pensions & Security, 479 So.2d 66 (Ala.Civ.App.1985). (I note that the record in this case reveals that C.V. presented the birth mother with a check that he suggested she use to pay for an abortion.)
In my opinion, C.V.'s prebirth conduct constitutes abandonment under § 26-18-7(a)(1), Ala.Code 1975. I also believe the trial court, in determining that C.V.'s parental rights had been terminated by operation of law and that, therefore, his consent to the adoption was not required, correctly considered C.V.'s failure to pay a reasonable portion of the child's support, an additional consideration under § 26-18-7(b)(1). The record establishes not only that C.V. failed to provide Baby Boy G.'s mother any financial support before Baby Boy G.'s birth, but also that he has paid no support since the child's birth and that he has paid nothing toward the expenses of the child's birth. While some members of this Court excuse C.V.'s nonpayment of child support, I believe he had an obligation to support the child's birth mother before Baby Boy G.'s birth and to pay child support until the date the prospective adoptive parents were granted an interlocutory decree in the adoption proceeding. C.V. has asserted his rights, but he has not accepted his responsibilities.
Because the record supports by clear and convincing evidence the trial court's finding that C.V. abandoned Baby Boy G., the issue before us is not whether C.V. consented to the adoption under § 26-10A-11, but rather whether, under § 26-10A-10, C.V.'s consent or relinquishment was required. I believe it was not. I believe the trial court's order granting permanent custody to J.M.J. and T.F.J. and granting the adoption by the trial court should be affirmed. However, a majority of this Court does not agree with me. Having lost on this issue, however, I agree that it is appropriate to allow the trial court to determine who should have custody of Baby Boy G. In doing so, it should be *731 mindful of the following facts and principles.
On July 30, 1997, the Circuit Court of Pinellas County, Florida, entered an order declining to continue exercising jurisdiction over the father's paternity and custody action. The Circuit Court of Tuscaloosa County has determined that C.V. is the natural father of Baby Boy G. The prospective adoptive parents have been awarded temporary legal and physical custody of the minor child.
As to a child born out of wedlock, the natural mother has a prima facie superior right of custody. Jackson v. Farmer, 247 Ala. 298, 24 So.2d 130 (1945); Garrett v. Mahaley, 199 Ala. 606, 75 So. 10 (1917). If the mother does not seek custody or is found by the court to be an unfit parent, the father of a child born out of wedlock, whose paternity has been established, has a prima facie right to custody of a child over a third party. Ex parte D.J., 645 So.2d 303 (Ala.1994).
A father's prima facie right to custody of a child over the rights of a third party may be overcome by a finding that the father is unfit. A parent may forfeit the prima facie right to custody of his child by his or her conduct. Jackson v. Farmer, supra. The November 17, 2000, opinion recognized that C.V.'s conduct before and after Baby Boy G.'s birth is relevant to his fitness as a parent. It is well established that the prima facie right of a parent to custody is not absolute; instead, the question of prime importance is the welfare of the child. Id.
The Circuit Court of Tuscaloosa County is the proper court to determine who should have custody of Baby Boy G. That court may consider all evidence relevant in a child-custody proceeding and shall apply applicable Alabama custody law, including the provisions of Title 30 Ala.Code 1975. The court may consider the evidence of domestic violence in deciding custody or visitation questions as to Baby Boy G. §§ 30-3-130 to -136, Ala.Code 1975. The circuit court is also in the best position to decide other paternity- and custody-related matters, such as reasonable visitation, child support, and reimbursement to the State of Florida of the birth expenses of the minor child. The "best interest of the child" standard is the appropriate standard in making those determinations. This case has been before the courts of this State for an unreasonably long period; therefore, the trial court should act promptly.
HARWOOD, Justice (statement of recusal).
I am obliged to recuse myself from participating in this case based on the provisions of Canon 3.C.(1)(a) of the Canons of Judicial Ethics. Canon 3.C.(1)(a) provides that a judge should disqualify himself from participating "in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned, including but not limited to instances where ... [h]e has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."
I was a circuit judge in Tuscaloosa County from the initiation of these legal proceedings in that judicial circuit in December 1996, to the ruling of the Alabama Court of Civil Appeals in February 1999. At all stages this case was handled by my colleague and personal friend, Judge Philip Lisenby. Judge Lisenby conducted various hearings and other proceedings in the case and issued the April 28, 1998, order terminating the parental rights of the biological father, C.V., and allowing Baby Boy G. to be adopted by the couple with whom he had resided since shortly after his birth. During the pendency of the case, the issues presented became matters of intense *732 emotional interest to many citizens of the community. There were many public demonstrations of support for the adoptive parents, including "pickets" near the courthouse and candlelight vigils and other gatherings on the front steps of the courthouse. The case was often hotly debated throughout the community. Because Judge Lisenby and I regularly ate lunch together, aspects of the case sometimes entered our discussions, although we always respected ethical boundaries. Several members of my family developed an active interest in the case and frequently discussed the proceedings with me as those proceedings evolved and rulings were announced. Several people I was acquainted with knew the adoptive parents personally, and those people were emphatic advocates of the couple's cause, often volunteering "inside" information about the parties involved. Frequent articles about the case in the local press and numerous television broadcasts and radio talk shows aired locally generated intense interest in the case. I did not attempt to insulate myself from any of these sources because at that time I saw no possibility that there would be an occasion for me, as a circuit judge, to rule on any aspect of the case. Judge Lisenby and another of our local circuit judges handled all "family court" cases for our circuit. Further, I did not decide to become a candidate for a place on this Court until sometime after the Court of Civil Appeals had issued its opinion in mid-February 1999.
As a result of my participation in numerous discussions about the case during 1997, 1998, and early 1999, I acquired information about the case and about the parties, and that information has had an impact on me. The various attitudes and understandings I developed might affect my analysis of the legal issues presented to this Court. Clearly, I have gained "personal knowledge of disputed evidentiary facts concerning the proceedings." Canon 3.C.(1)(a). In such a situation, "an appellate judge who ha[s] prior knowledge of the appellant's background and of the nature of the offense at issue should recuse himself." Noah v. State, 494 So.2d 870, 873 (Ala.Crim.App.1986).
Accordingly, I recuse myself from this case.
NOTES
[1] I understand that scores of letters by concerned citizens have been sent to me and to other members of this Court. However, as a Justice of this Court, I am prohibited from reading and considering such ex parte communications. Canon 3.A.(4), Canons of Judicial Ethics.
[2] On December 20, 2000, this Court ordered the parties to mediate their dispute and appointed retired Supreme Court Justice Mark Kennedy to act as the mediator.
[3] Upon entering the office of Associate Justice of this Court, I took the following oath, as required by the Alabama Constitution of 1901:

"I solemnly swear that I will support the Constitution of the United States, and the Constitution of the State of Alabama, so long as I continue a citizen thereof; and that I will faithfully and honestly discharge the duties of the office upon which I am about to enter, to the best of my ability. So help me God."
Art. XVI, § 279, Ala. Const 1901.
[4] The fact that a child has been placed with unrelated persons for a long period does not alone give those custodians a permanent legal right to custody of that child, as if custody of a child could be acquired through some sort of "adverse possession." See In re Wakefield, 365 Mo. 415, 425, 283 S.W.2d 467, 473 (1955) ("Their past custody of the child does not necessarily result in any enforceable future rights, for there is no doctrine of right by adverse possession in the custody of children."); Ross v. Hoffman, 33 Md.App. 333, 343, 364 A.2d 596, 602 (1976) ("Children are not chattels, and doctrines such as adverse possession, however semantically regaled, do not apply to children.").
[5] The trial court's express findings of fact tend to support the opposite conclusion. The trial court noted in its findings that C.V. is now married, that he and his wife have a son, and that C.V. and his wife "appear to provide adequate parenting to their child."
[6] Section 26-10A-9, Ala.Code 1975, was amended effective June 11, 1999, to add the following subsection:

"(1) Abandonment of the adoptee. Abandonment includes, but is not limited to, the failure of the father, with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth."
[7] See § 26-10A-9(1), as amended effective June 11, 1999, which now requires a father to support his unborn child.
[8] Section 26-18-7, Ala.Code 1975, was amended effective April 22, 1998. The quoted material is from § 26-18-7 as it read before that amendment.
[9] Effective June 11, 1999, § 26-10A-9(1) provides: "Abandonment includes, but is not limited to, the failure of the father, with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth." Thus, as of June 11, 1999, Alabama recognizes "prebirth abandonment" by a father as implied consent to an adoption, or as relinquishment of his parental rights. Id.
[10] The Alabama Child Protection Act, § 26-18-1 et seq. Ala.Code 1975, uses the term "child" (not "minor") throughout. The Alabama Adoption Code § 26-10A-1 et seq. uses the terms "child," "minor," and "adoptee" but § 26-10A-10 uses only the words "child" and "adoptee."